KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting: Effective 1789, we Americans “set up government by consent of the governed.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 641, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Under the United States Constitution, all of the federal government’s power derives from the people. U.S. Const. pmbl.; see McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405, 4 L.Ed. 579 (1819) (“In form, and in substance, it emanates from them.”). Much of that power has been further delegated to a warren of administrative agencies, making accountability more elusive and more important than ever. Nowadays we the people tolerate bureaucrats “poking into every nook and cranny of daily life,” City of Arlington v. FCC, 569 U.S. 290, 133 S.Ct. 1863, 1879, 185 L.Ed.2d 941 (2013) (Roberts, C.J., dissenting), on the theory that if they exercise their delegated power unjustly, inexpertly or otherwise at odds with the popular will, we can elect legislators and a President who will take corrective action, Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 865, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (underscoring that “[wjhile agencies are not directly accountable to the people,” they report to political actors who are). But consent of the governed is a sham if an administrative agency, by design, does not meaningfully answer for its policies to either of the elected branches. Such is the case with the Consumer Financial Protection Bureau (CFPB). The CFPB, created by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. No. 111-203, Title X, 124 Stat. 1376, 1955-2113 (July 21, 2010), perma.cc/6K2U-CD9W,[1] is an agency like no other. Its Director has immense power to define elastic concepts of unfairness, deception and abuse in an array of consumer contexts; to enforce his rules in administrative proceedings overseen by employees he appoints; to adjudicate such actions himself if he chooses; and to decide what penalties fit the violation. The Director does all that and more without any significant check by the President or the Congress. Dodd-Frank gives the Director a five-year tenure—thereby outlasting a Presidential term—and prohibits the President from removing him except for cause. At the same time, the statute guarantees the CFPB ample annual funding from the Federal Reserve System, outside the ordinary appropriations process. It thus frees the agency from a powerful means of Presidential oversight and the Congress’s most effective means short of restructuring the agency. Finally, the Director is unique among the principal officers of independent agencies-in that he exercises vast executive power unilaterally: as a board of one, he need not deliberate with anyone before acting. ‘ In my view, Dodd-Frank Title X, otherwise known as the Consumer Financial Protection Act, violates Article II: its “language providing for good-cause removal is .., one of a number of statutory provisions that, working together, produce a constitutional violation.” Free Enter. Fund v. PCAOB, 561 U.S. 477, 509, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Under Article II, “[t]he executive Power shall be vested in a President” who “shall take Care that the Laws be faithfully executed.” U.S. Const, art. II, §§ 1, 3. In Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the United States Supreme Court explained that the President must ordinarily have “unrestricted power” to remove executive officers if he is to faithfully execute the laws. Id. at 176, 47 S.Ct. 21. More recently, the Court in Free Enterprise Fund emphasized “the importance of removal”—based on “simple disagreement with [an agency’s] policies or priorities”-— as a means of: ensuring that the. modern administrative state does not “slip from the Executive’s control, and thus from that of the people.” 561 U.S. at 499, 502, 130 S.Ct. 3138. Here, when taken together with the rest of Title X, the for-cause removal provision in effect puts the CFPB beyond the people’s reach. I recognize that Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), made an exception to the President’s “exclusive power of removal,” Myers, 272 U.S. at 122, 47 S.Ct. 21, in-holding that the Congress “can, under certain circumstances,- create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause,” Free Enter. Fund, 561 U.S. at 483, 130 S.Ct. 3138 (emphasis added) (citing Humphrey’s Ex’r, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611). But Humphrey’s Executor remains the exception, not the rule, and it does not apply here. Humphrey’s Executor upheld a for-cause limit on the President’s authority to remove commissioners of the Federal Trade Commission (FTC), a “legislative agency” headed by a “non-partisan” “body of experts” whose staggered terms ensure that the commission does not “completely] change at any one time” but instead gains collective expertise., even as individual members come and go. 295 U.S. at 624, 628, 55 S.Ct. 869. By contrast, the CFPB is not a legislative agency, if that means an agency that reports to the Congress.[2] Nor is it a nonpartisan body of experts. Unlike -the five FTC commissioners, only three of whom can be members of the same political party, the CFPB’s sole Director does not have to bother with the give and take required of a bipartisan multimember body. Also, the CFPB’s membership is subject to complete change all at once,- at five-year intervals that do not coincide with the four-year term of the President. The imperfect overlap means that for -much of the President’s term—sometimes all of it—the sole “regulator of first resort ... for a vital sector of our economy,” Free Enter. Fund, 561 U.S. at 508, 130 S.Ct. 3138, might well be faithful to the policies of the last President, not the views of the current one. First principles, not Humphrey’s Executor, control here. This unaccountable agency violates them. I disagree with the majority’s conclusion to the contrary. Further, although I agree with portions of Judge Kavanaugh’s dissent, I cannot join it, primarily because it would strike and sever Title X’s for-cause removal provision. Even assuming that remedy would bring the CFPB fully in line with the Constitution, I do not think we can dictate it to the Congress. Severability turns on whether the statute, minus any invalid provision, “-will function in a manner consistent with the intent of Congress” and “is legislation that Congress would ... have enacted.” Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (emphasis in original). Statutory text, structure and history manifest the 111th Congress’s belief that the CFPB’s independence from both of the elected branches is indispensable. Excising only the for-cause removal 'provision would leave behind a one-legged agency that, by all indications, the Congress would riot have created. True, the introduction to the 849-page Dodd-Frank legislation includes a standard-form severability clause. But such a clause raises only a “presumption” that “the objectionable provision can be excised.” Alaska Airlines, 480 U.S. at 686, 107 S.Ct. 1476. The presumption is rebutted here. As I see it, Dodd-Frank’s sever-ability clause speaks to severing Title X from other titles of the legislation but does not support severing'the for-cause removal provision from the rest of Title X. Accordingly, I would invalidate Title X in its entirety and let the Congress decide whether to resuscitate—and,- if so, how to restructure—the CFPB. I would set aside the Director’s decision as ultra vires and forbid the agency from resuming proceedings. Because the en banc Court’s decision permits this case to continue before the agency, I respectfully dissent.[3] I. THE CFPB’S STRUCTURE VIOLATES ARTICLE II The administrative agencies sprawled across Washington, D.C.—especially the “independent” ones—do not fit comfortably within the text and structure of the Constitution.[4] FTC v. Ruberoid Co., 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J„ dissenting) (“[Ajdmin-istrative bodies ... have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories .....”); see Philip Hamburger, Is Administrative Law Unlawful? 1-2 (2014) (“Constitution generally establishes three avenues of power” but administrative state “prefers to drive off-road”). Cognizant of modern-day complexities, and bowing to perceived necessity, the judiciary has made .accommodations such as Humphrey’s Executor. But the accommodations have limits and the CFPB exceeds them. A. The President’s Removal Power Three Article II cases—Myers, Humphrey’s Executor and Free Enterprise Fund—set forth the legal framework for deciding the CFPB’s constitutionality. I discuss each in turn. 1. Myers One would not know it from the CFPB’s one-sentence treatment, CFPB Br. 32, but Myers is a “landmark,” Free Enter. Fund, 561 U.S. at 492. In 1917, President Wilson, by and with the advice and consent of the Senate, appointed Frank Myers to a four-year term as first-class postmaster. Myers, 272 U.S. at 56, 106. He did so pursuant to an 1876 statute providing in relevant part that “[pjostmasters of the first, second and third classes shall be appointed and may be removed, by the President by and with the advice and consent of the Senate.” Id. at 107 (quoting Act of July 12, 1876, ch. 179, § 6, 19 Stat. 80, 81). In 1920, for reasons undisclosed in the Myers opinion,[5] President Wilson removed Myers from office without the Senate’s advice and consent. Id. at 106-07. Invoking the 1876 statute, Myers sued for “salary from the date of his removal.” Id. at 106. He lost. In an opinion authored by Chief Justice Taft— Wilson’s predecessor as President—the Supreme Court held that requiring the President to obtain advice and consent in order to remove an executive officer violates Article II. Id. at 108,176. Because the Constitution contains “no express provision respecting removals” and “[t]he subject was not discussed in the Constitutional Convention,” 272 U.S. at 109-10, 47 S.Ct. 21, the Court focused on the First Congress, id. at 111-36, 47 S.Ct. 21. In 1789, the First Congress enacted a law that effectively recognized “the power of the President under the Constitution to remove the Secretary of Foreign Affairs”—now the Secretary of State—“without the advice and consent of the Senate.” Id. at 114, 47 S.Ct. 21; see id. at 111-15, 47 S.Ct. 21. The Court gave “great[ ] weight” to the. debates on the bill because the First Congress “numbered among its leaders those who had been members of the Convention.” Id. at 136, 174-75, 47 S.Ct. 21. The Court pointed especially to James Madison’s “masterly” arguments about the removal power because they “carried the House.” Id. at 115, 47 S.Ct. 21. Collecting the views of Madison and his colleagues, and “supplementing them” with “additional considerations” of its own, the Court declared that generally the President’s “executive power” “includ[es] ... the exclusive power of removal.” Id. at 115, 122, 47 S.Ct. 21. The Court supported that general proposition with four reasons rooted in constitutional text, structure and function. Id. at 115-35, 47 S.Ct. 21. First, Article II gives the President not only the power to execute the laws but the obligation “to take care that they be faithfully executed.” 272 U.S. at 117, 47 S.Ct. 21. He cannot do so “unaided”; he needs “the assistance of subordinates.” Id. Because “his selection of administrative officers is essential to” his faithful execution of the laws, “so must be his power of removing those for whom he can not continue to be responsible.” Id. (citing 1 Annals of Cong. 474 (1789) (Joseph Gales ed., 1834) (available in photo, reprint, William S. Hein & Co. 2003) (statement of Fisher Ames)). And because the crown—the British executive—had the power to appoint and remove executive officers, “it was natural” for the Framers “to regard the words ‘executive power’ as including both.” Id. at 118, 47 S.Ct. 21. Second, the Constitution divides legislative and executive powers, giving them to two separate but coequal political branches as a check against oppression by either. 272 U.S. at 120-21, 47 S.Ct. 21. Some Framers had thought it an “unchaste” “mingling” of the legislative and executive powers even to give the Senate the job of advising on and consenting to the President’s appointments. Id. at 120, 47 S.Ct. 21 (quoting 1 Annals of Cong. 557 (statement of Abraham Baldwin)). In the First Congress, Madison and others cautioned against “‘extend[ing] this connexion’” to “the removal of an officer who has served under the President.” Id. at 121, 47 S.Ct. 21 (quoting 1 Annals of Cong. 380 (statement of James Madison)). Whereas a veto on the appointment power merely “enables the Senate to prevent the filling of offices with bad or incompetent men,” a veto on the President’s “exclusive power of removal” entangles the Congress in an executive function: deciding whether an incumbent officer has the requisite “loyalty” to the President’s agenda. Id. at 121-22,131,134, 47 S.Ct. 21. Third, the President’s removal power is especially strong with respect to principal executive officers. 272 U.S. at 126-29, 47 S.Ct. 21. The first half of the Appointments Clause requires the President personally to appoint, with the Senate’s advice and consent, “Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law.” U.S. Const, art. II, § 2, el. 2. By way of an “exception,” 272 U.S. at 127, 47 S.Ct. 21, the second half of the Appointments Clause provides: “[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.” U.S. Const. art. II, § 2, cl. 2. The Congress accordingly has “legislative power in the matter of appointments and removals in the case of inferior executive officers.” 272 U.S. at 127, 47 S.Ct. 21 (citing United States v. Perkins, 116 U.S. 483, 485, 6 S.Ct. 449, 29 L.Ed. 700 (1886)). “By the plainest implication,” however, the Appointments Clause “excludes Congressional dealing with appointments or removals of executive officers not falling within the [inferior-officer] exception, and leaves unaffected the executive power of the President to appoint and remove” principal officers. Id. Fourth, the Framers did not “intend[ ], without express provision, to give to Congress ... the means of thwarting the Executive ... by fastening upon him, as subordinate executive officers, men who by their inefficient service,” -“lack of loyalty” or “different views of policy” would make it “difficult or impossible” for him to “faithfully execute[ ]” the laws. 272 U.S. at 181, 47 S.Ct. 21. The removal power was vested in the President to help him “secure th[e] unitary and uniform execution of the laws,” id. at 135, 47 S.Ct. 21, and to preserve a discernible “chain” of “responsibility” from appointed officers to the President and from the President to the people, id. at 131-32, 47 S.Ct. 21 (quoting 1 Annals op Cong. 499, 523 (statements of James Madison and Theodore Sedgwick)). For those four reasons, the Court concluded that the President must ordinarily have “unrestricted power” to “remov[e] ex-, ecutive officers who ha[ve] been appointed by him by and with the advice and consent of the Senate.” 272 U.S. at 176, 47 S.Ct. 21. Because the 1876 statute restricting removal of postmasters violated that general rule, the Court invalidated the statute. Id.. 2. Humphrey’s Executor Less than a decade after Myers, the Supreme Court in Humphrey’s Executor again addressed the scope of the President’s removal power, this time in the context of the FTC. Under section 1 of the Federal Trade Commission Act (FTC Act), an FTC commissioner “may be -removed by the President for inefficiency, neglect of duty, or malfeasance in office.” 15 U.S.C. §41. In 1933, President Roosevelt requested the resignation of William Humphrey, a business-friendly FTC commissioner appointed by President Coolidge and reappointed by President Hoover. 295 U.S. at 618, 55 S.Ct. 869; see Richard A. Harris & Sidney M. MilHis, the Politics op Regulatory Change: a Tale op Two Agencies 153 (2d ed. 1996) (noting that Humphrey’s appointment was perceived as “transform[ing] the FTC into an agency that served not as an overseer but a partner of business” (internal quotation omitted)). In his correspondence with Humphrey, President Roosevelt cited “polic[y]” differences and “disclaim[ed] any reflection upon the commissioner personally or upon his services.” 295 U.S. at 618-19, 55 S.Ct. 869 (internal quotation omitted). Humphrey refused to resign and the President removed him. Id. at 619, 55 S.Ct. .869. Humphrey died shortly thereafter but his executor sued to recover Humphrey’s salary from the date of removal. Id. at 618-19, 55 S.Ct. 869. The Court in Humphrey’s Executor confronted two questions. First, does section 1 of the FTC - Act prohibit the President from removing an FTC commissioner for any reason other than inefficiency, neglect or malfeasance? 295 U.S. at 619, 55 S.Ct. 869. Second, if so, “is such a restriction or limitation valid under the Constitution”? Id. The Court answered yes to both questions. Id. at 632, 55 S.Ct. 869. In considering the first' question, the Court described at length “the character of the commission,” id. at 624, 55 S.Ct. 869, as manifested in the FTC Act’s text and legislative history, id. at 619-26, 55 S.Ct. 869.. And in considering the second question, the Court indicated that “the character of the office” would determine the Congress’s ability to restrict the President’s removal power. Id. at 631, 55 S.Ct. 869. In other words, the constitutionality of the FTC Act, like any other law, depended on its content. The CFPB resists this truism, suggesting the “Court’s discussion of the FTC’s structure” is irrelevant because it “comes in the statutory interpretation part of the decision.” CFPB Br. 31. But Humphrey’s Executor makes plain that,- if we are to understand what it says about Article II, we must understand the structure of the agency it sustained. 295 U.S. at 632, 55 S.Ct. 869 (holding that President’s “unrestrictable power” of removal “does not extend to an office such as that here involved” (emphasis added)); see Free Enter. Fund, 561 U.S. at 516, 130 S.Ct. 3138 (Breyer, J., dissenting) (recognizing that applicability of Humphrey’s Executor turns in part on “the nature of the office,” “its function” and “its subject matter”); see also Maj.- Op. 86, 93 (“Supreme Court looks to the character of the office” and “the sort of agency involved” when “analyzing where Congress may deploy ... for-eause protection” (internal quotation omitted)). As summarized in Humphrey’s Executor, the FTC’s structure is as follows: • It is composed of five commissioners. 295 U.S. at 619-20, 55 S.Ct. 869. To- . gether they “are called upon to exercise the trained judgment of a body of experts ... informed by experience.” Id. at 624, 55 S.Ct. 869 (internal quotation omitted). • The FTC has certain “powers of investigation,” id. at 621, 55 S.Ct. 869, but they are legislative rather than executive because they are for the purpose of making reports and recommendations to the Congress, id. at 621, 628, 55 S.Ct. 869. • With the advice and consent of the Senate, the President appoints each ' commissioner to a seven-year term staggered with those of his fellow commissioners. Id. at 620, 624, 55 S.Ct. 869. The duration and “arrange[ment]” of the terms foster collective expertise. Id. at 624, 55 S.Ct. 869 (seven years is “ ‘long enough’ ” to “ ‘acquire ... expertne'ss’ ” if “membership [is not] subject to complete change at any one time” (quoting S. Rep. No. 63-597, at 11 (1914))). • The FTC is a “non-partisan” “agency of the legislative and judicial departments.” Id. at 624, 630,. 55 S.Ct. 869. “Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative.” Id. at 624, 55 S.Ct. 869; see id. at 628-29, . 55 S.Ct.- 869. To ensure the FTC’s “entire impartiality” in carrying out its duties—and to [1] insulate it from - “suspicion of partisan direction”—no ■ - more than three of its commissioners . can' be members of the same political party. Id. at 620, 624-25, '55 S.Ct. 869. ' Having made these observations, the Court concluded that án FTC commissioner “is so essentially unlike” a first-class postmaster that Myers “cannot be accepted as controlling our decision here.” 295 U.S. at 627, 55 S.Ct. 869. Unlike a postmaster, the Court reasoned, an FTC commissioner “exercises no part of the executive power ... in. the constitutional sense.” Id. at 628, 55 S.Ct. 869. Rather, “[t]o the,extent that [the FTC] exercises any executive function, ... it does so in the discharge and effectuation of its quasi-legislative and quasi-judicial powers” as an expert agency “charged with the enforcement of no policy except the policy of the law.” Id. at 624, 628, 55 S.Ct. 869. In the Court’s view, just as the Congress has limited power to interfere with the President’s removal of executive officers, the President has “[]limitable power” to remove- FTC commissioners because they are legislative or judicial officers. Id. : at 629, 65 S.Ct. 869; see id. at 630, 55 S.Ct. 869 (“The sound application of-a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.”). 3. Free Enterprise Fund In Free Enterprise Fund, the Supreme Court’s most recent decision on the scope of the removal power, the Court was asked to extend Humphrey’s Executor to “a new situation” it had “not yet encountered.” 561 U.S. at 483, 130 S.Ct. 3138. It declined the invitation. At issue were provisions that precluded the Securities and Exchange Commission (SEC) from removing members of the Public Company Accounting Oversight Board (Board) except for cause. Id. at 486, 130 S.Ct. 3138 (citing 15 U.S.C. §§ 7211(e)(6), 7217(d)(3)). Based on the “understanding” that SEC commissioners “cannot themselves be removed by the President except” for cause, id. at 487, 130 S.Ct. 3138, the Court held that two layers of “good-cause protection” violate Article II because together they prevent the President from “oversee[ing] the faithfulness” of officers who “determinen the policy and enforce[ ] the laws of the United States,” id. at 484,130 S.Ct. 3138. The Court acknowledged that the Congress has “power to create a vast and varied federal bureaucracy” to ensure “apolitical expertise.” 561 U.S. at 498-99, 130 S.Ct. 3138 (internal quotation omitted). But faced with a “novel structure” not squarely authorized by Humphrey’s Executor or any other precedent, id. at 496,130 S.Ct. 3138; see id. at 483, 492-96, 514, 130 S.Ct. 3138, the Court returned to the most fundamental of first principles: “Our Constitution was adopted to enable the people to govern themselves, through their elected leaders.” Id. at 499, 130 S.Ct. 3138. In view of that principle, the Court held that the Congress could not “encasef ]” the Board “within a Matryoshka doll of tenure protections” and thereby “immunfize] from Presidential oversight” the “regulator of first resort ... for a vital sector of our economy.” Id. at 497, 508, 130 S.Ct. 3138; see id. at 485, 130 S.Ct. 3138 (detailing Board’s “expansive powers to govern an entire industry” through rulemaking, audits, inspections, investigations, monetary penalties and other forms of discipline). Concluding otherwise, the Court reasoned, would sever the chain of responsibility linking the Board to the people via the President. Id. at 495, 130 S.Ct. 3138 (“The result is a Board that is not accountable to the President, and a President who is not responsible for the Board.”). B. The Cfpb’s Structural Defects Under the foregoing framework and considering Title X as a whole, I believe the CFPB’s structure violates Article II. 1. Novelty For me the initial question is whether the Supreme Court has “encountered” an agency like the CFPB or if, instead, its structure is “novel.” Free Enter. Fund, 561 U.S. at 483, 496, 130 S.Ct. 3138. Although structural “innovation” is not itself unconstitutional, Mistretta v. United States, 488 U.S. 361, 385, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); see Maj. Op. 53-54, a novel agency fights uphill: “the lack of historical precedent for [an] entity” is “[pjerhaps the most telling indication of [a] severe constitutional problem.” Free Enter. Fund, 561 U.S. at 505, 130 S.Ct. 3138 (internal quotation omitted). The CFPB argues that it is sufficiently like the FTC to fall within the ambit of Humphrey’s Executor. CFPB Br. 13-14, 18-21, 23, 30-31. It also relies on Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), which involved the independent counsel. CFPB Br. 18-21, 24-25, 31-32. Finally, along with Humphrey’s Executor and Morrison, my colleagues invoke Wiener v. United States, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), which involved a claims adjudicator. Maj. Op. 78-79, 85-91, 93, 94, 96, 105, 109-10; Wilkins Concurring Op. 115-16, 118. None of this is precedent for the CFPB or its Director. Before explaining why, I recap essential elements of the CFPB’s design. a. Title X Equating financial products with household appliances, Professor Elizabeth Warren in 2007 advocated for the creation of a federal agency to protect consumers from “[ujnsafe” mortgages, student loans and credit cards in the same way the Consumer Product Safety Commission protects consumers from exploding toasters. Elizabeth Warren, Unsafe at Any Rate, Democracy (Summer 2007), perma.cc/52X3-892V. She proposed that the Congress consolidate in the new agency the power to administer most federal consumer-protection laws, the result being “the review of financial products in a single location.” Id. The proposed agency was to be “independent” of “national politics],” the “financial ... industry lobby” and “legislative micromanaging.” Id. Freed of such burdens, the agency could take “quick action” to solve the problems regularly generated by a financial services industry bent on “increasing] profits.” Id. The agency, in short, was to “side” with consumers against the industry. Id. Consistent with Professor Warren’s proposal, Title X established the CFPB as “an independent bureau” to “regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws.” 12 U.S.C. § 5491(a). It transferred to the CFPB the authority to enforce eighteen existing laws previously administered by seven different federal agencies. Id. §§ 5481(12), 5581(a)(2), (b). Those eighteen laws cover most consumer credit products, including mortgages, student- loans and credit cards. The CFPB now has all but exclusive power “to prescribe rules or issue orders or guidelines pursuant to” all eighteen laws. Id. § 5581(a)(1)(A); see id. §§ 5481(12), 5512(b)(4). The agency also has expansive new powers under Title X to investigate, charge, adjudicate and penalize—through (inter alia) subpoena, rescission, restitution, disgorgement and monetary penalties—a consumer-connected “act or practice” the agency defines as “unfair, deceptive, or abusive.” Id. § 5531(a), (b); see id. §§ 5562-5565. ■ The CFPB’s expansive powers are vested in and derive from its sole Director. 12 U.S.C. § 5491(b)(1) (Director is “head” of CFPB); id. § 5491(b)(5)(A) (Director appoints Deputy Director); id. § 5492(b) (Director “may delegate to any duly authorized employee, representative, or agent any power vested in the Bureau by law”); id. § 6493(a)(1)(A) (Director “fix[esj the number of’ CFPB employees and “appoint[sj” and “direct[sj” all of them); id. § 5512(b)(1) (Director “may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof’). The President appoints the Director “by and with the advice and consent of the Senate.” 12 U.S.C. § 5491(b)(2). The Director is thereafter insulated from both political branches. He has a five-year term, id. § 5491(c)(1), and the President may remove him only “for cause,” i.e., “inefficiency, neglect of duty, or malfeasance in office,” id. § 5491(c)(3).[6] At the same time, the Director obtains funding from the Federal Reserve System, outside the Congress’s appropriations process. Id. § '5497(a)(1), On a quarterly basis, the Director determines how much money the CFPB “reasonably” needs, id., up to- 12 per cent of. the Federal Reserve budget, id. §'5497(a)(2)(A)(iii). The Federal Reserve “shall” then transfer that amount to the CFPB.[7] Id. § 5497(a)(1). The money “shall not be subject to review by the Committees on Appropriations of the House-of Representatives and the Senate.” Id. § 5497(a)(2)(C). Nor does the Director need “any” form of “consent or approval” from the executive branch’s Office of Management and Budget (OMB), which lacks “any jurisdiction or oversight over the affairs or operations of the Bureau.” Id. § 5497(a)(4)(E). b. CFPB distinguished from FTC The agency just described is not even a distant' cousin of the FTC blessed by Humphrey’s Executor. I see at least three critical distinctions. , First, like nearly all other administrative agencies, the FTC is and always has been subject to the appropriations process. 15 U.S.C. § 42; see Harris & Minas, supra, at 146, 204-05 (discussing FTC appropriations); see also "Note, Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection, 125 Harv. L. Rev. 1822, 1823 (2012). (Budgetary Autonomy) '(“A •complete exemption from appropriations is rare ....”). Accordingly, the FTC must go to the Congress every year’with a detailed budget’ request explaining its expenditure of public money. See, e.g., FTC, Fiscal Year 2018 Congressional Budget Justification (May 22, 2017) (185-page request), perma.cc/4V7G-83JL. The procedure provides a measure of public accountability and helps explain the Supreme Court’s description of the FTC as a “quasi-legislative” agency that “report[s] to Congress.” Humphrey’s .Ex’r, 295 U.S. at 621, 624, 628-29, 55 S.Ct. 869. The CFPB is different. As the agency itself declares, it is “fund[ed] outside of the congressional appropriations process to ensure full independence.” CFPB, Strategic Plan: FY2013-FY2017, at 36 (Apr. 2013), perma.cc/XQW5-5S5S. The agency has made the most of its autonomy: when legislators have sought explanation for its spending or policies, it has stonewalled. See, e.g., Letter from Rep. Randy Neuge-bauer et al. to Richard Cordray (May 2, 2012) (noting CFPB’s “wholly unresponsive” posture to “requests for additional budget information”), ' perma.ee/NTH6-KR98; Letter from Sen. Rob Portman et al. to Richard Cordray (Oct. 30, 2013) (seeking “greater transparency for the Bureau’s activity”), perma.cc/5N3Z-GGCQ. Perhaps the best illustration is a 2015 hearing in which a legislator asked the Director who authorized a CFPB project that cost more than $215 million. House Financial Services Committee, Hearings and Meetings (Mar. 17, 2015), www. congress.gov/committees/video/house-financial-services/hsba00/5IxSfJ638es. The Director replied: “Why does that matter to you?” Id. The appropriations process has long been considered “the most potent form of Congressional oversight.” 2 Senate Committee on Government Operations, Study on Federal Regulation- Congressional Oversight of Regulatory Agencies 42 (1977); see Michael J. Klarman, The Framers’ Coup: The Making of the United States Constitution 16 (2016) (founding generation “generally embraced the maxim that the power which holds the purse-strings absolutely will rule” (internal quotation and brackets omitted)). Because of its freedom from appropriations, the CFPB cannot be called “an agency of the legislative ... department ]” and the Congress cannot be called its “master.” Humphrey’s Ex’r, 295 U.S. .at 630; 55 S.Ct. 869. The agency argues that, whatever its accountability to the Congress, its budgetary independence “does not interfere with the President’s power to take cafe that the laws be faithfully executed.” CFPB Br. 28 & n.8 (emphasis added); see Maj. Op. 41 (“The CFPB’s budgetary independence ... does not intensify any effect on the President of the removal constraint.”). . The contention overlooks the President’s constitutional role in the budget process. Lest it be,forgotten,.the Presentment Clause gives the President the power to veto legislation, including spending bills. U.S. Const, art. I, § 7, cl. 2. Armed with that authority and the prerogative to “recommend to [the Congress’s] Consideration such Measures as he shall judge necessary and expedient,” U.S. Const, art. II, § 3, the President has for the past century submitted an annual budget to the Congress, see Louis Fisher, Congressional Abdication on War and Spending 24 (2000) (tracing practice to Budget and Accounting Act of 1921). Indeed, the President has long been required to submit an annual budget. 31 U.S.C. § 1105(a). Acting through OMB', the President uses his annual budget to influence the policies of' independent agencies,' including the FTC.’ Elóise Pasachoff, The President’s Budget as a Source of Agency Policy Control, 125 Yale L.J. 2182,' 2191, 2203-04 (2016) (independent agencies “must participate in the annual budget cycle under [the] oversight” of OMB’s Resource Management Offices, which in turn “serve as a conduit for policy and political direction from the President” and his staff); see, e.g., Harris & Milkis,- supra, at 204-05 (noting policy-driven budget cuts at FTC under President Reagan). The President lacks that leverage over the CFPB, which stands outside the budget. 12 U.S.C. § 5497(a)(1). ■ . Similarly, the President requires the FTC and other independent- agencies to {inter alia), “prepare an agenda of all regulations under development or review” and submit them to the Office of Information and Regulatory Affairs, an arm of OMB, to ensure “coordination of regulations” that “promote the President’s priorities.” Exec. Order No. 12866 § 4, 58 Fed. Reg. 51735 (Sept. 30, 1993); see Exec. Order No. 13563 § 1(b), 76 Fed. Reg. 3821 (Jan. 18, 2011) (“reaffirm[ing]” 1993 order). But the requirements apply only “to the extent permitted by law,” Exec. Order No. 12866 § 4, and Title X exempts the CFPB by shielding it from OMB’s “jurisdiction or oversight,” 12 U.S.C. § 5497(a)(4)(E). Second, unlike the FTC, the CFPB is not a “non-partisan” commission pursuing “entire impartiality” in law and policy. Humphrey’s Ex’r, 295 U.S. at 624, 55 S.Ct. 869. In contrast to the FTC, see id. at 620,' 55 S.Ct. 869, the CFPB does not have a partisan balance requirement. Its single Director is from a single party—in most cases, presumably, the party of the President who appoints him. The CFPB contends that its single-Director, single-party structure is no greater threat.to the President’s faithful execution of the laws than is the FTC’s multimember bipartisan structure. CFPB Br. 23-32. In fact, the CFPB says, the President can more easily replace or persuade one Director than three of five commissioners. See, e.g., Oral Arg. Tr. 49; see also Maj. Op. 35, 43-44 (making similar points). But if the President’s dissatisfaction is rooted in policy, it is just as impossible for him to remove a single official with for-eause protection as it is to remove several such officials.[8] And whether directed at one officer or more, attempts at persuasion are no substitute for removal. Free Enter. Fund, 561 U.S. at 502, 130 S.Ct. 3138 (“Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.”). Moreover, because of the mismatch between the President’s four-year term and the Director’s five-year term, the CFPB’s entire leadership may for much of the President’s tenure—and sometimes all of it—identify with a political party other than the President’s. This does not happen at the FTC. The difference matters for accountability: a minority party of a multi-member agency is “a built-in monitoring system,” dissenting when appropriate and serving as a “fire alarm” for the President and the public. Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15,41 (2010). Further, whereas the FTC is structured to administer the laws apolitically and with “impartiality,” Humphrey’s Ex’r, 295 U.S. at 624, 55 S.Ct. 869, the CFPB’s design encourages the opposite. Title X gives the Director latitude to define and punish “unfair, deceptive, or abusive acts or practices” broadly or narrowly, depending on his policy preferences. 12 U.S.C. § 5531(a), (b); see id. § 5531(c), (d) (malleable statutory definitions of “unfair” and “abusive”). The legislators who supported Title X expected the Director to use that power— together with his authority over eighteen other laws—to “stick[] up for the little guy” in the “battle” against “all the big sharks and lobbyists and lawyers who are ganged up against [him].” 156 Cong. Rec. 6364, 6366, 7015 (2010) (statements of Sen. Whitehouse); see id. at 3187 (statement of Sen. Kaufman) (CFPB is to “look[] out totally for the interest of consumers and consumers alone”).[9] The agency’s first Director shared that one-sided vision, describing his “sole focus” as “protecting consumers.” CFPB, Written Testimony of CFPB Director Richard Cordray Before the House Committee on Financial Services (Mar. 3, 2015), perma.ee/GAG6-ENDN. I do not question the importance of protecting consumers. But an agency cannot be considered “impartial[ ]” under Humphrey’s Executor if in partisan fashion it uniformly crusades for one segment of the populace against others. Consistent with its design, that is what the CFPB has done. See Dep’t of Treasury, A Financial System That Creates Economic Opportunities: Banks and Credit Unions 82-87 (June 2017) (Economic Opportunities) (cataloging questionable practices CFPB has undertaken at expense of regulated parties), perma.cc/V3SC-yXBH; Amicus Br. of U.S. Chamber of Commerce 16-29 (same). By at least some accounts, for instance, the CFPB under its first Director hired all but exclusively from one political party, deliberately weeding out applicants from other parties and the banking industry. Todd Zywicki, The Consumer Financial Protection Bureau: Savior or Menace ?, 81 Geo. Wash. L. Rev. 856, 877,' 895 (2013) (asserting that agency hired staffers and “true believers” from one political party); Ronald L. Rubin, The Tragic Downfall of the Consumer Financial Protection Bureau, Nat’l Rev., Dec. 21, 2016 (alleging, from insider’s perspective, that agency used “screening techniques”), per-ma.cc/VR9F-TWHQ; cf. Bill McMorris, 100% of CFPB Donations Went to Democrats, Wash. Free Beacon, Nov. 23, 2016 (reporting that, during 2016 Presidential election, CFPB employees made more than 300 donations totaling about $50,000, all of which went to candidates of one party), perma.cc/6JVQ-RRRQ. Additionally, the CFPB provides an online forum for consumers to complain publicly about providers of mortgages, student loans, credit cards and other financial products. CFPB, Consumer Complaint Database, perma.cc/VT2D-E6K5. The agency acknowledges that some complaints may be misleading or flat wrong. Disclosure of Consumer Complaint Narrative Data, 79 Fed. Reg. 42765, 42767 (July 23, 2014) (“[T]he narratives may contain factually incorrect information ....”). Without attempting to verify them, the agency publishes the complaints anyway, knowing it is providing a “megaphone” for debtors who needlessly damage business reputations. CFPB, Prepared Remarks of CFPB Director Richard Cordray at the Consumer Response Field Hearing (July 16, 2014), perma.cc/4S3G-9ALK. Compare that blinkered outlook with the FTO’s approach. The FTC likewise provides a complaint database to help deter and detect unfair business practices. But its database can be accessed only by law enforcement agencies, yielding similar value without the rep-utational costs. FTC, Consumer Sentinel Network, perma.cc/M5TZ-5USM. One cannot help but think that the' difference in the FTC’s policy owes at least in part to the difference in its design. Consider also PHH’s case. In rulings reinstated today, see Maj. Op. 16-17, the panel rejected: the Director’s new interpretation of the anti-kickback provision of the Real Estate Settlement Procedures Act (RESPA), PHH Corp. v. CFPB, 839 F.3d 1, 39-44 (D.C. Cir. 2016), vacated upon grant of reh’g en banc (Feb. 16, 2017); his attempt to apply that interpretation retroactively to PHH, id. at 44-49; his construction of RESPA’s limitations provision, id. at 52-55; and his theory that the CFPB is bound by no limitations period in any administrative enforcement action under any of the laws the agency administers, id. at‘50-52. The issues were “not a close call”: the CFPB flunked “Rule of Law 101” and was called out for “gamesmanship” and “absurd[]” reasoning. Id. at 41, 48-49, 55. An agency that gets the law so badly wrong four times over in its first major case in this circuit has a steep climb in claiming “[i]t is charged with the enforcement of no policy except the policy of the law." Humphrey’s Ex’r, 295 U.S. at 624, 65 S.Ct. 869. Third, and relatedly, the Director is not a “body of experts” “informed by experience,” Humphrey’s Ex’r, 295 U.S. at 624, 55. S.Ct. 869 (internal quotation omitted), because he is not a body at all. "When a Director leaves at the end of his term, he takes with him all of the expertise and experience that his board of one has collected in five years. The new Director— faced with a one-sided mission and armed with unilateral power to administer a complex web of laws at the heart of the credit economy—starts with no expertise qua rector and has no coequal colleagues with whom to deliberate. Far from “promoting] stability and confidence,” Maj. Op. 81; see id: at 78, 92, full turnover from one insulated Director to the next is a recipe for jarring policy changes and costly rookie mistakés, see, e.g., PHH Corp., 839 F.3d at 7 (multitude of errors “resulted in a $109 million order against” PHH). By contrast, each FTC commissioner is informed by fellow commissioners who have years of collective experience as commissioners. See Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769, 794 (2013) (“[Mjulti-member agencies allow for the development of institutional memory.”). From the FTC’s inception, its staggered multimem-ber structure has been central to its functions. The Congress passed the FTC Act in part because of dissatisfaction with the Bureau of Corporations, “a single-headed organization” better suited to “investigation and publicity” than to “judgment and discretion.” 51 Cong. Rec. 11092 (1914) (statement of Sen. Newlands, sponsor- of FTC Act). As the Senate- Report explained: It is manifestly desirable that the terms of the commissioners' shall bé long enough to give them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience. The terms of the commissioners should expire in different years, in order that such changes as may be made from time to time shall not leave the commission deprived of men of experience in such questions. One of the chief advantages of the proposed commission over the Bureau of Corporations lies in the fact that it will have greater prestige and independence, and its decisions, coming from a board of several persons, will be more readily accepted as impartial and well considered. S. Rep. No. 63-597, at 10-11 (1914). The CFPB’s proponents view its single-Director structure as a strong selling point. In the 111th Congress, they advocated for a regulator who can “keep pace with the changing financial system” and “respond quickly and effectively to .... new threats to consumers.” S. Rep. No. 111-176, at 18, 40 (2010); see id., at 11 (agency must be “streamlined” and “have enough, flexi-. bility to address future problems as they arise”); 156 Cong. Rec. 6237 (2010) (statement of Sen. Whitehouse) (agency must “monitor the market and act. quickly .when there is a consumer hazard”); id. at 12436 (statement of Rep. Meeks) (agency must “act swiftly” to protect consumers “from unscrupulous behavior”); ' id. at 15025 (statement of Sen. Durbin) (agency must “keep up with’ the[ ] lawyers and accountants” of “the big banks on Wall Street”); cf. Warren, Unsafe at Any Rate, supra (agency must be prepared to take “quick action” against financial services industry). Similarly, in this Court, the agency’s proponents tout its single-Director structure as essential to preventing “the delay and gridlock to which multimember commissions are susceptible.” Amicus Br. of Current and Former Members of Congress Supporting CFPB 2; see id. at 15-20. I do not begin to assert that the Constitution “enacts social science about the benefits of group decision-making.” Tatel Concurring Op. 6 (internal quotation omitted). Far be it from a judge to question the Congress’s conclusion that a single Director beats a multimember commission as a fast-acting solution to real-time problems.’ See Buckley v. Valeo, 424 U.S. 1, 138-39, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (subject to constitutional constraints, Congress has authority to create and structure government offices “as it chooses”). My point is more modest: if the Director is a speedy unitary actor, he cannot also be a “quasi-legislative and quasi-judicial” “body of experts” . exercising “trained judgment” by considered consensus. Humphrey’s Ex’r, 295 U.S. at 624, 629, 55 S.Ct. 869; .compare The Federalist No. 70, at 472 (Alexander Hamilton) (Jr Cooke ed., 1961) (“power in a single hand” is exercised with “dispatch”), with John Locke, The Second Treatise of Civil Government, in 2 The Tradition op Freedom 201, 252 § 160 (M. Mayer ed., 1957) (legislative power is “too numerous and so too slow for the .dispatch requisite to execution”). In sum, the FTC is a deliberative expert nonpartisan agency that reports to the Congress.'The CFPB is,a unitary inexpert partisan agency that reports to no one. Because the former is no precedent for the latter, Humphrey’s Executor does not control here. c. CFPB Director distinguished from independent counsel As for Morrison, that ease and this one are not on the same jurisprudential planet. At issue in Morrison was (inter alia) whether the Ethics in' Government Act “impermissibly .interferes with the President’s exercise of his constitutionally appointed functions” by “restricting the Attorney General’s power to remove the independent counsel to. only those instances in which he can show ‘good cause.’ ” 487 U.S. at 685, 108 S.Ct. 2597. The Supreme Court found no violation. Id. at 685-93, 695-96, 108 S.Ct. 2597. Crucially, however, the Court recognized that “the independent counsel [was] an inferi- or officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority.” Id. at 691, 108 S.Ct. 2597 (emphasis added). The CFPB Director has even less in common with the independent counsel than with an FTC commissioner. As no one disputes, the Director is a principal officer. he has no “superior” who “direct[s] and supervise^” his work. Edmond v. United States, 520 U.S. 651, 662-63, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). The distinction between principal and inferior makes a considerable difference. The Constitution gives the Congress much more power over the appointment and removal of an inferior officer than over the appointment and removal of a principal officer, see U.S. Const, art. II, § 2, cl. 2; Myers, 272 U.S. at 126-29, 47 S.Ct. 21, at least where, as here, the principal officer is not a legislative agent under Humphrey’s Executor.[10] The distinction makes good sense “in the context of a Clause designed to preserve political accountability relative to important Government assignments.” Edmond, 520 U.S. at 663, 117 S.Ct. 1573. The more important the officer’s assignments, the more directly his actions implicate the President’s responsibility to faithfully execute the laws. Myers, 272 U.S. at 132, 47 S.Ct. 21 (President’s oversight “varies with the character of [the officers] service”); see id. at 132-33, 47 S.Ct. 21 (each principal executive officer charged with “highest and most important duties” of his department “must be the President’s alter ego”). And the more powerful the officer, the more likely the people will hold the President personally responsible if the officer formulates bad policy. 1 Annals of Cong. 499 (statement of James Madison) (describing “chain of dependence” from “lowest officers” to “middle grade” to “highest” to “President” to “community”); see, e.g., Editorial, President Cordray Strikes Again, Wall St. J., Oct. 5, 2017 (criticizing President for not removing Director), on. wsj.com/2xmzcii; Editorial, Republicans for Richard Cordray, Wall St. J., Aug. 11, 2017 (same), on.wsj.com/2fjuMpe; Editorial, Richard Cordray’s Financial Damage, Wall St. J., July 12, 2017 (same), on. wsj.com/2w7nulr; Editorial, Trump to Cordray: You’re Not Fired, Wall St. J., June 20, 2017 (same), on.wsj.com/2hjw2G5. The Director is more powerful than the independent counsel and poses a more permanent threat to the President’s faithful execution of the laws. The independent counsel had “limited jurisdiction” to investigate and prosecute crimes pursuant to Department of Justice policy. Morrison, 487 U.S. at 691, 108 S.Ct. 2597; see id. at 672, 108 S.Ct. 2597. She lacked “any authority to formulate policy” of her own. Id. at 671, 108 S.Ct. 2597; see id: at 691, 108 S.Ct. 2597. She performed no “administrative duties outside of those necessary to operate her'office.” Id. at 671-72,108 S.Ct. 2597. She had “limited ... tenure” and “no ongoing responsibilities”: her “temporary” office “terminated” when she finished investigating or prosecuting the matters for which she was called to duty..Id. at 672, 108 S.Ct. 2597 (internal quotation omitted); see id. at 664, 691,108 S.Ct. 2597. The Director’s jurisdiction and tenure, by contrast, are anything but “limited” and “temporary.” He has all but exclusive power to make and enforce rules under eighteen preexisting consumer laws and a nineteenth in Title X itself. 12 U.SiC. §§ 5481(12), 5512(b)(4), 5562-5565, 5581(a)(1)(A). Under the latter, his power to define and punish “unfair, deceptive, or abusive acts or practices” is cabined by little more than his imagination.. Id. § 5531(a), (b). Absent inefficiency, neglect or malfeasance, he is guaranteed five years in which to impose on the people his version of consumer protection. 12 U.S.C. § 5491(c)(1), (3). And the cycle immediately begins, again when he is through. d. CFPB Director distinguished from claims adjudicator Wiener has still less bearing on this case than Morrison does. The parties apparently recognize as much, as their briefs do not cite it. In 1948, the Congress established the War Claims Commission, a temporary body consisting of three Commissioners whose sole task was to “adjudicate according to law” claims seeking compensation for injuries suffered during World War II. Wiener, 357 U.S. at 349-50 (quoting War Claims Act of 1948, Pub. L. No. 80-896, § 3, 62 Stat. 1240, 1241 (July 3, 1948)). In 1950, President Truman, by and with the advice and consent of the Senate, appointed Myron Wiener as a Commissioner. Id. In 1953, President Eisenhower removed Wiener not for lack of “rectitude” but because the President wanted " ‘personnel of my own selection.’” Id. at 350, 356. The Commission was abolished in 1954. Id. at 350. Wiener sued for salary from the date of his removal. Id: at 350-51. Viewing Wiener’s case as a “variant” of Humphrey’s Executor, the Supreme Court held that the War Claims Act implicitly protected him from removal except for cause, and that the statute so construed was consistent with Article II. Wiener, 357 U.S. at 351, 78 S.Ct. 1275; see id. at 352-56, 78 S.Ct. 1275. The Court noted that Humphrey’s Executor “explicitly ‘disapproved’ the expressions in Myers supporting the President’s inherent constitutional power to remove members of quasi-judicial bodies.” Id. at 352, 78 S.Ct. 1275 (quoting Humphrey’s Ex’r, 295 U.S. at 626-27, 55 S.Ct. 869). Emphasizing “the intrinsic judicial character of the task with which the Commission was charged”—i.e., adjudicating individual claims based on “evidence and governing legal considerations”—the Court concluded that “[t]he philosophy of Humphrey’s Executon■” controlled. Id. at-355-56, 78 S.Ct. 1275. As I read it, Wiener stands for the narrow proposition that the Congress can constitutionally bestow for-cause protection on an officer whose primary function is adjudication, given his need for independence. 357 U.S. at 355, 78 S.Ct. 1275; see The Constitutional Separation of Powers Between , the President and Congress, 20 Op. O.L.C. 124, 170 & n.120 (1996) (suggesting Wiener is limited to officers “whose only functions are adjudicatory” or at most to officers “whose primary duties involve the adjudication of disputes involving private persons”), perma.ee/DF3R-FFER. The CFPB is not a quasi-judicial body. Nor does its Director have an “intrinsic judicial character.” Wiener, 357 U.S. at 355, 78 S.Ct. 1275. Nor does the Director have as his primary function the adjudication of disputes. Adjudicative power is only a fraction of his entire authority. He is no less than the czar of consumer finance. In that realm, he is legislator, enforcer and judge. See supra pp. 83-84, 91-92. James Madison wrote that “[t]he accumulation of all powers legislative, executivé, and judiciary in the same hands ... may justly be pronounced the very definition of tyranny.” The Fedebalist No. 47, at 324. The Director’s adjudicative power is part of the reason he meets Madison’s definition of a tyrant. And a tyrant with complete authority over “a vital sector of our economy,” Free Enter. Fund, 561 U.S. at 508, 130 S.Ct. 3138, cannot but threaten the Presi.dent’s faithful execution of the laws in that realm; In my estimation, then, the Director’s adjudicative power does not exempt him from at-will removal.[11] My colleagues invoke Madison for the opposite conclusion. Maj. Op. 85, 91; Wilkins Concurring Op. 114-16. They point to his statement in the First Congress that “there may be strong reasons why”. the Comptroller of the Treasury “should not hold his office at the pleasure of the Executive branch.” 1 Annals op Cong. 612. He underscored that the Comptroller—whose “principal duty seems to be deciding upon the lawfulness and justice of the claims and accounts subsisting between the United States and particular citizens”—“partakes strongly of the judicial character.” Id. at 611t12. For reasons just explained, that observation is inapposite here. It does not describe the CFPB Director, whose “principal duty” consists of far more than adjudicating “claims and accounts” through rote application of existing law.[12] Id. [[Image here]] In short, the CFPB and its Director have no ancestor in Humphrey’s Executor, Morrison or Wiener. Undeterred, the CFPB takes a divide-and-conquer approach to the structural features that in combination differentiate it from any predecessor. It contends that each feature has no constitutional import standing alone and that, collectively, they add up to no problem at all. Oral Arg, Tr. 66-67 (“[W]hen you add them all together you’re adding zero plus zero plus zero plus zero, and at the end of the day ... you’re still there with zero.”). The apt analogy is not math but chemistry: even if innocuous in isolation, some elements are toxic in combination. See, e.g., The Cambridge Encyclopedia 328 (D. Crystal ed., 1990) (cyanide, merely carbon plus nitrogen, is deadly); see also Free Enter. Fund, 561 U.S. at 496, 130 S.Ct. 3138 (second layer of for-cause protection did not only “add to the Board’s independence, but transformed] it”); id. at 509, 130 S.Ct. 3138 (“a number of statutory provisions,” “working together,” “producefd] a constitutional violation”); Ass’n of Am. R.Rs. v. Dep’t of Transp., 721 F.3d 666, 673 (D.C. Cir. 2013) (“[J]ust because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute.”), vacated on other grounds, — U.S. —, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015). The CFPB is not the. first agency exempt from appropriations. See Budgetary Autonomy, supra, at 1823 (pointing out, however, that list of other exempt agencies is “short” and “composed of narrowly focused” regulators “operating] in technical sectors”). It is not the first agency headed by a single official or lacking a partisan balance requirement. See Datla & Revesz, supra, at 793-94 & nn.125, 127 (listing agencies headed by single official); id. at 797 (listing agencies with no partisan balance requirement). It is not the first agency with sweeping rulemaking and enforcement powers over an entire sector of the economy—the SEC comes to mind. But the CFPB is the only agency that combines each and every one of these elements with for-cause removal protection and a mission to “side” with one segment of the population against others. Neither the Supreme Court nor our Court has upheld anything like it before. 2. Diminution of the Presidency Because the CFPB falls between the existing removal cases, our job is to decide the agency’s validity under first principles.[13] Humphrey’s Ex’r, 295 U.S. at 632, 55 S.Ct. 869 (acknowledging possible “field of doubt” between Myers and Humphrey’s Executor and “leav[ing] such cases as may-fall within it for future consideration”). So I go back to the beginning. Because “[o]ur Constitution was adopted to enable the people to govern themselves, through their elected leaders,” the President “as a general matter” has power to remove the principal officers of an agency—based on “simple disagreement with the [agency’s] policies or priorities”—as a means of ensuring that the agency does not “slip from the Executive’s control, and thus from that of the people.” Free Enter. Fund, 561 U.S. at 499, 502, 513, 130 S.Ct. 3138; see id. at 509, 130 S.Ct. 3138 (“Under the traditional default rule, removal is incident to the power of appointment.”); id. at 513, 130 S.Ct. 3138 (“The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so.”). If it were otherwise, the President would be “fastened]” to subordinates who “by their lack of loyalty” or “different views of policy” would make it “difficult or impossible” for him to “faithfully executef ]” the laws. Myers, 272 U.S. at 131, 47 S.Ct. 21. To date, the Supreme Court has recognized only one exception to the default rule: Humphrey’s Executor. The CFPB violates the rule, see 12 U.S.C. § 5491(c)(3), and does not fit within the exception, see supra pp. 15-28, 96 S.Ct. 612. The question, then, is whether we should stretch the exception to reach the CFPB. That is what my colleagues do today, even if they do not say so. But just as we cannot overrule Supreme Court decisions, Shea v. Kerry, 796 F.3d 42, 54 (D.C. Cir. 2015); see Tatel Concurring Op. 113, we have no business fundamentally recalibrating them, Humphries v. Ozmint, 397 F.3d 206, 225 n.9 (4th Cir. 2005) (en banc) (“we, as judges of an inferior court, are without liberty to change” Supreme Court “framework”). Even if the FTC and the CFPB were not as dissimilar as I believe they are, I would be loath to cede any more of Article II than Humphrey’s Executor squarely demands. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 525-26, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (opinion of Scalia, J.) (“There is no reason to magnify the separation-of-powers dilemma posed by the headless Fourth Branch ....”); see also Ziglar v. Abbasi, — U.S. —, 137 S.Ct. 1843, 1864, 198 L.Ed.2d 290 (2017) (“[E]ven a modest extension is still an extension.”). Given the CFPB’s novelty, we must “[a]t the very least” “‘pause to consider the implications of ” sustaining it. Cf. Nat’l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. 519, 550, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (opinion of Roberts, C.J.) (quoting United States v. Lopez, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)). The CFPB assures us that “the President has an 80 percent chance ... to be guaranteed an opportunity to replace the Bureau’s Director.” Oral Arg. Tr. 49. That is hardly comforting. It means there is a twenty per cent chance the President will have no at-will opportunity to replace the agency’s leader—and no real policy influence over the agency—for the entirety of the President’s four-year term. Furthermore, the odds grow ever larger that the President will have no such opportunity or influence during his first three years, first two years, first year and first hundred days. The President cannot be reduced to appointer-in-chief, cf. Free Enter.. Fund, 561 U.S. at 502, 130 S.Ct. 3138, especially if his appointment power turns on luck of the draw, see id. at 500, 130 S.Ct. 3138 (separation of powers “cannot be permitted to turn on” “bureaucratic minutiae” (internal quotation omitted)). Even assuming the CFPB violates Article II only some of the time—a year here, a couple years there—that is not a strong point in its favor. Heedless of the implications for the Presidency, my colleagues plow ahead and sustain the agency anyway. The case-specific result is disturbing enough: the people will suffer this agency’s unnecessary mistakes for years to come. Worse, however, is that the majority’s logic invites aggregation. Suppose the Congress over time decides to restructure, say, the FTC, the SEC, the Federal Election Commission (FEC) and the National Labor Relations Board (NLRB) so that each stands outside of the appropriations process and is headed by a single political-minded director removable only for cause and tenured for five years.[14] Or make it seven years. Cf. 15 U.S.C. § 41 (tenure for FTC commissioner). Or fourteen years. Cf. 12 U.S.C. § 241 (tenure for member of Federal Reserve Board of Governors). Now throw in fourteen years for the CFPB Director. I can discern no reason why the majority would not approve all of that and more if it happened one step at a time. But if the FTC, SEC, FEC, NLRB and CFPB were each headed by a fast-acting partisan director with fourteen years of tenure, the policy havoc they could collectively inflict from within the executive branch without having to answer to the executive would be too much for Article II to bear. The erosion of Presidential responsibility, no less than the “accretion” of Presidential power, can be “dangerous” even when it “does not come in a day.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring); see Free Enter. Fund, 561 U.S. at 497, 130 S.Ct. 3138 (“[I]f allowed to stand, this dispersion of responsibility could be multiplied.”); id. at 499,130 S.Ct. 3138 (“[Wjhere, in all this, is the role for oversight by an elected President?”). I would draw the line right here and now. 3. Lack of accountability If forced to expand the Humphrey’s Executor exception, I would limit it to an agency that answers in some meaningful way to the policy oversight of at least one political branch. See Myers, 272 U.S. at 131-32, 47 S.Ct. 21 (emphasizing need for “chain” of “responsibility” from appointed officers to populace (quoting 1 Annals Of Cong. 499, 523 (statements of James Madison and Theodore Sedgwick))); see also Free Enter. Fund, 561 U.S. at 501, 130 S.Ct. 3138 (“The Framers created a structure in which ‘[a] dependence on the people’ would be the ‘primary controul on the government.’” (quoting The Federalist No. 51, at 349 (James Madison))); McCulloch, 17 U.S. (4 Wheat.) at 405 (ours is “a government of the people”). The CFPB fails even this minimal test of accountability. The agency and its proponents cite a grab bag of purported checks on the agency’s authority but none is an adequate substitute for removal at the President’s will.[15] First, the Congress’s ability to restructure the CFPB is not an adequate substitute check. Contra, e.g., CFPB Br. 28 n.8 (emphasizing that Congress can pass legislation subjecting CFPB to appropriations process); Amicus Br. of Americans for Financial Reform- et al. 15 (pointing out that Congress can amend “organic statute” if it wants to “revisit[ ]” agency’s design). In Free Enterprise Fund, the Supreme Court rejected the contention that the SEC’s functional control over the Public Company Accounting Oversight Board “blun[ted] the constitutional impact of for-cause removal,” 561 U.S. at 504, 130 S.Ct; 3138' (internal quotation omitted). The Court explained that “altering the budget or powers of an agency as a whole is a problematic way to control an inferior officer. The [SEC] cannot wield a free hand to supervise individual members if it must destroy the Board in order to fix it.” Id. The Court’s reasoning applies with equal force to the Congress’s ability to restructure the CFPB. See Oral Arg. Tr. 34, Free Enter. Fund v. PCAOB, S. Ct. No. 08-861 (Dec. 7, 2009) ’ (Justice Scalia: “I’m not sure that [the Congress’s] ability to take away responsibility ... from an agency is the same as controlling what authority that agency does exercise.” (emphasis added)). Refashioning the agency as a whole is a ham-handed way to monitor the Director’s handling of a specific policy matter. Similarly, threatening to alter the agency does not give the Congress much leverage either. Any Director with the political instinct for the job knows that, nowadays especially, transformative legislation is akin to a bolt of lightning. See Perry v. MSPB, — U.S. —, 137 S.Ct 1975, 1990, 198 L.Ed.2d 527 (2017) (Gorsueh, J., dissenting) (“[T]he demands of bicameralism and presentment are real and the process can be protracted. [And] the difficulty of making new laws isn’t some bug in the constitutional design; it’s the point of the design .... ”); Budgetary Autonomy, supra, at 1831-32 (describing hurdles such as “crowded-.agenda,” “filibuster” and need for “support of congressional leadership”). At all events, an otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future. Second, judicial review under the Administrative Procedure Act is not a meaningful substitute check. Contra, e.g., Ami-cus Br. of Americans for Financial Reform et al. 15. Some of the CFPB’s excesses will “occur[ ] in the twilight of judicially unre-viewable discretion.” PHH Corp., 839 F.3d at 35; see Chevron, 467 U.S. at 844-45, 104 S.Ct. 2778; 12 U.S.C. §§ 5512(b)(4)(B), 5581(b)(5)(E)(ii); 15 U.S.C. § 1693b(e)(l). And even if the courts could review de' novo everything the CFPB does, that would not suffice for today’s purpose. The chain of responsibility from the agency to the judiciary does not then link to the people. Federal judges “have no constituency,” Chevron, 467 U.S. at 866, 104 S.Ct. 2778, and are therefore no proxy for the people’s representatives in deciding consumer-finance policy, TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (courts decide legal questions, leaving it to “political branches” to decide “what accords with common sense and the public weal” (internal quotation omitted)). Third, procedural requirements associated with CFPB rulemaking are not a meaningful substitute check. Contra, e.g., Amicus Br. of Financial Regulation Scholars 23. Granted, the agency must adhere to notice-and-comment. procedures, 5 U.S.C. §§ 500(a)(1), 551, 553; must “consider” the costs and benefits of proposed rules, 12 U.S.C. § 5512(b)(2)(A); and must “consult” with other financial regulators about the rules, id. § 5512(b)(2)(B). But rulemaking requirements cannot, constrain the CFPB when it formulates policy through an enforcement action rather than rulemaking. The CFPB has done this a lot, perhaps because of the rulemaking requirements. See Dep’t of Treasury, Economic Opportunities, supra, at 82-83 (describing CFPB’s “[e]xcessive reliance on enforcement actions, rather than rules and guidance, to regulate conduct”). Notably, the CFPB has initiated no rulemaking to explain to the regulated public, ex ante, what the agency will deem “an unfair, deceptive, or abusive act or practice.” 12 U.S.C. § 5531(a). Nor is there any indication in the briefs or the record before us that the agency has any plans to change its know-it-when-we-see-it approach. See CFPB, Prepared Remarks of CFPB Director Richard Cordray at the Consumer Bankers Association (Mar. 9, 2016) (suggesting that CFPB’s critics “set[ ] the bar too high” in expecting agency to “think through and explicitly articulate rules for every eventuality” before initiating enforcement.actions), perma.cc/79TC-BQMA. Fourth, and finally, the threat of super-majority veto by the Financial Stability Oversight Council is not-a meaningful substitute check. Contra, e.g., Amicus Br. of Financial Regulation Scholars 23; Wilkins Concurring Op. 119-21. The Council (another unelected body) can “set aside a final regulation” of the CFPB only if the regulation “would put the safety and soundness of the United States banking system or the stability ■ of the financial system of the United States at risk.” 12 ■ U.S.C. § 5513(a). As far as the Council is concerned, then, the CFPB can break the law or abuse its power as long as it does so (1) in an enforcement action or (2) in a regulation that does not threaten 'national financial ruin. A recent episode illustrates how toothless the Council’s veto is in controlling CFPB policy. In July 2017, the CFPB fínálized one of its most cpntroversial policies to date: a rule prohibiting certain providers from entering arbitration agreements with consumers to stave off class actions. CFPB, Final Rule: Arbitration Agreements (July 10, 2017), per-ma:cc/N3JH-573A. Thé acting Comptroller of the Currency, one of the Council’s ten voting members, 12 U.S.C. § 5321(b)(1)(C), sought data so that- he could determine the 'rule’s “safety and soundness implications.” Letter from Keith Noreika to Richard Cordray (July 17, 2017), perma.cc/3X6D-YZS6. In response, the CFPB Director asserted that, because the rule’s projected impact is “less than $1 billion per year,” it is “plainly frivolous” to suggest the rule “poses a safety and soundness ’ issue.” Letter from Richard Cordray to Keith Noreika (July 18, 2017), permh.cc/76MU-39PC; The Director also implied' that the Comptroller was “distorting] the FSOC process” because of-a mere “disagree[ment] with the policy judgments for the rule.” Id. The rule was published in the Federal Register the next day.[16] Arbitration Agree-merits, 82 Fed. Reg. 33210 (July 19, 2017). The fact that anyone mentions the Council’s narrow veto as a check is instead a testament to the CFPB’s unaccountable policymaking power. II. THE FOR-CAUSE REMOVAL PROVISION CANNOT BE SEVERED FROM THE REST OF TITLE X Judge Kavanaugh and I agree that Title X’s for-cause removal provision, 12 U.S.C. § 5491(c)(3), is unconstitutional. But he would excise section 5491(c)(3) and preserve the rest of Title X. Kavanaugh Dissenting Op. 198-200. I respectfully disagree with that approach. Above all else, the 111th Congress wanted the CFPB to be independent: free, that is, from industry influence and the changing political tides that come with accountability to the President. Severing section 5491(c)(3) would yield an executive agency entirely at odds with the legislative design. In my view, the Congress would not have enacted Title X in its current form absent for-cause removal protection. I believe, therefore, that the appropriate remedy for the CFPB’s Article II problem is to invalidate Title X in its entirety.[17] A. The Law of Severability When remedying a constitutional defect, a court should not “nullify more of a legislature’s work than is necessary” because the “ruling of unconstitutionality” already “frustrates the intent of the elected representatives of the people.” Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (internal quotation omitted). Neither, however, should the court use the severability doctrine to “rewrit[e]” an unconstitutional statute because that also “circumventfs] the intent of the legislature.” Id. at 329-30, 126 S.Ct. 961 (internal quotation omitted); see Free Enter. Fund, 561 U.S. at 510, 130 S.Ct. 3138 (doctrine does not give court “editorial freedom”); United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875) (court cannot “introduce words” into statute). With those competing considerations in mind, the court must ask whether the statute minus any invalid provision “will function in a manner consistent with the intent of Congress” and “is legislation that Congress would ... have enacted.” Alaska Airlines, 480 U.S. at 685, 107 S.Ct. 1476 (emphasis in original). If the answer to either component of the question is no, the invalid provision cannot be severed. Id. In deciding the question, the court looks to the statute’s “language,” “structure” and “legislative history.” Id. at 687, 107 S.Ct. 1476; see, e.g., id. at 687-97, 107 S.Ct. 1476 (weighing all three); Regan v. Time, Inc., 468 U.S. 641, 652-55, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion) (same); INS v. Chadha, 462 U.S. 919, 931-35, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (same); see also 2 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes & Statutory Construction § 44:3, at 591-92 (7th ed. 2009) (noting related factors such as “circumstances” of enactment and “object” of statute). A severability clause can be probative of legislative intent but it is by no means dispositive. Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924) (“[I]t is an aid merely; nqt an inexorable command.”); see United States v. Jackson, 390 U.S. 570, 585 n.27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (“[T]he ultimate determination of severability will rarely turn on the presence or absence of such a clause.”); 2 Singer & Singer, swpra, § 44:8, at 627 (“Because of the frequency with which it is used, the separability clause is regarded as little more than a mere formality.”). In the federal courts, a severability clause creates only a rebuttable “presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision.” Alaska Airlines, 480 U.S. at 686, 107 S.Ct. 1476; see Dorchy, 264 U.S. at 290, 44 S.Ct. 323 (treating severability clause as “a rule of construction”). Thus, the Supreme Court sometimes declines to sever an invalid provision despite a severability clause. See, e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 425 n.8, 445-46 n.37, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 83-84, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Sloan v. Lemon, 413 U.S. 825, 833-35, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Hill v. Wallace, 259 U.S. 44, 70-71, 42 S.Ct. 453, 66 L.Ed. 822 (1922). B. Independence As Sine Qua Non Op Title X At the outset of Title X, the Congress “established” the CFPB as “an independent bureau.” 12 U.S.C. § 5491(a).[18] The Supreme Court has long used the term “independent agenc[y]” to describe an agency run by principal officers sheltered from the “President’s power to remove.” Buckley, 424 U.S. at 136, 96 S.Ct. 612; see, e.g., Bowsher v. Synar, 478 U.S. 714, 725 n.4, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Significantly, the Court used the same definition in Free Enterprise Fund just a few weeks before the Congress enacted Title X. 561 U.S. at 483, 130 S.Ct. 3138 (“Congress can, under certain circumstances, create independent agencies run by principal officers' appointed by the President, whom the' President may not remove at will but only for good cause.”). Because we are to assume the Congress is familiar with Supreme Court precedents—especially the “unusually important” ones, Cannon v. Univ. of Chicago, 441 U.S. 677, 699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)—“an independent bureau” is best understood to mean the kind of agency Free Enterprise Fund described: one whose principal officer enjoys for-cause removal protection. In other words, section 5491(a) ties the CFPB’s very existence to its freedom from the President. That is powerful evidence the Congress opposed the idea of a CFPB answerable to him. Other statutory features reinforce the conclusion. As discussed earlier, the Congress transferred to the CFPB the authority to enforce and issue rules under eighteen existing laws previously administered by seven different federal agencies. 12 U.S.C. §§ 6481(12), 6512(b)(4), 6581. A majority of those agencies are themselves more or less free from Presidential , control. Id, § 5581(a)(2)(A) (Federal Reserve Board of Governors, Federal Deposit- Insurance Corporation, FTC and National Credit Union Administration). Reinventing the CFPB as an executive agency through excision of section 5491(c)(3) would by judicial decree transfer to the executive branch far-reaching new powers that, before Title X, resided with several non-executive agencies. Even- if that result might be worth cheering for the purpose of-accountability, it is not what the Congress had- in mind. The floor statements in support of Title X highlighted, more than any other consideration, the CFPB’s .need for independence. See, e.g,, 156 Cong. Rec. 2052 (2010) (statement of Rep. Tsongas); id. at 3187 (statement of Sen. Kaufman); id. at 6237, 6365, 7015 (statements of Sen. Whitehouse); id. at 6240 (statement of Sen. Franken); id. at 6990 (statement of Sen. Reid); id, at 7481, 7485-86, 8931 (statements of Sen. Dodd); id. at 9447 (statement of Rep. Kilroy); id. at 9839 (statement of Rep. Holt); id. at 1Í814 (statement of Rep. Lee); id. at 12434 (statement of Rep. Maloney); id. at 13135 (statement of Sen. Cardin), Likewise, in this Court, the CFPB’s strongest backers have repeatedly emphasized its independence as a sine qua non. See, e.g;, Amicus Br. of Current and- Former Members of Congress Supporting Rehearing En Banc 2 (“By ... severing the provision that made [the] Director removable only for cause, the panel decision fundamentally- altered the CFPB and hampered its ability-to function as Congress intended.”); Amicus Br. of Americans for Financial Reform et al. 2-3 (“The Bureau’s independence has been critical -tp its ability to remain a steadfast enforcer of the consumer protection laws despite massive political opposition from the financial industry.”); Amicus Br. of Financial Regulation Scholars 17-18 (“Regulated industries are likely to bring concentrated political pressure to bear on the White House to influence an agency whose head is' subject to at-will removal to adjust- policy in favor 'of the industry.”); of. Maj. Op. 83, 110 (Congress sought to “insulat[e]” CFPB “from political winds and [P]residential will” but panel -majority, by excising section 5491(c)(3), “effectively turned the CFPB into an instrumentality of the President”). Indeed, the Congress so valued the CFPB’s independence that it forfeited its own oversight by -exempting the agency from• appropriations. The intent,--as the CFPB’s architects made plain, was to give the -agency watertight freedom from both of the elected branches, lest the agency’s mission be compromised by shifting popular will, the “financial ... industry lobby” or “legislative micromanaging.” Warren, Unsafe at Any Rate, supra; see, e.g., S. Rep. No. 111-176, at 163 (finding that “adequate funding, independent of the Congressional appropriations process, is absolutely essential” to CFPB’s “independent operations”); 156 Cong. Rec; 8931 (statement-of Sen. Dodd) (“[T]he [CFPB’S] funding will be independent and- reliable so that its mission cannot be compromised by political maneuvering.”).[19] The upshot is that excising- section 5491(c)(3) would yield a mutant CFPB responsive to the President—and hence to majoritarian politics and lobbying—but nowise accountable to the Congress. Where, as here, severing a statutory provision “alters the balance of powers between the Legislative and Executive Branches,” we must consider whether our effective “delegation[ ] of power to the Executive ... may have been so' controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism.” Alaska Airlines, 480 U.S. at 685, 107 S.Ct. 1476 (considering severability of legislative veto). After all, “one branch’s handicap is another’s strength” and vice versa. Free Enter. Fund, 561 U.S. at 500, 130 S.Ct. 3138. A CFPB responsive to the President would have been too “controversial” to pass the 111th Congress. Alaska Airlines, 480 U.S. at 685, 107 S.Ct. 1476. At the very least it would not have passed absent “strong oversight” via the appropriations process. Id. But we judges cannot subject the agency to appropriations; to. do so would be to “blue-pencil” still more of Title X, Free Enter. Fund, 561 U.S. at 509, 130 S.Ct. 3138, and potentially introduce new provisions of our own. Nor can we convert the agency into a multimember commission. True, in contrast to a CFPB responsive to the President, a multimember CFPB “would deviate less radically from Congress’ intended system.” United States v. Booker, 543 U.S. 220, 247, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); see Amicus Br. of Current and Former Members of Congress Supporting CFPB. 17-20 (Congress seriously considered multimember structure). Yet that alternative, too, would be a rewrite for the Congress and ■ not the courts. See Free Enter. Fund, 561 U.S. at 509-10, 130 S.Ct. 3138; Ayotte, 546 U.S. at 329-30, 126 S.Ct. 961; Reese, 92 U.S. at 221. The best argument for excising section 5491(c)(3) is Dodd-Frarik’s severability clause, 12 U.S.C. § 5302, but it'does not change my view. Appearing in the mega Dodd-Frank legislation 574 pages before section 5491(c)(3), see 124 ,Stat at 1390, 1964, section 5302 provides in relevant part that “[i]f any provision of this Act ... is held to be unconstitutional, the remainder of this Act ... shall not be affected thereby.” The clause says nothing specific about Title X,. let alone the CFPB’s independence, let alone for-cause removal, let alone the massive transfer of power, inherent in deleting section 5491(c)(3), let alone whether the Congress would have endorsed that transfer of power even while subjecting the CFPB to the politics of Presidential control. ..Instead, as one of Dodd-Frank’s architects said decades earlier of a materially identical clause: “This is just boilerplate severability.” 134 Cong. Rec. 12280 (1988) (statement of Rep. Frank). Thus, beyond the standard presumption that section 5302 creates, see Alaska Airlines, 480 U.S. at 686, 107 S.Ct. 1476, it tells us little about how the Congress would deal with invalidation of section 5491(c)(3) in particular, see Max Radio, A Short Way With Statutes, 56 Harv. L. Rev. 388, 419 (1942) (“Are we really to imagine that the legislature ... weighed each paragraph literally and c[a]me to the conclusion that it would have enacted that paragraph if all the rest of the statute were invalid?”). For ' reasons already stated, the presumption of severability is rebutted here. A severability clausé “does not give the court power to amend” a statute. Hill, 259 U.S. at 71, 42 S.Ct. 453. Nor is it a license to cut out the “heart” of a statute. Cf. Alaska Airlines, 480 U.S. at 691, 107 S.Ct. 1476. Because section 5491(c)(3) is at the heart of Title X, I would strike Title X in its entirety. * * * * * As a guarantor of self-government, Article II has always been “one of the Constitution’s best provisions.” Saikrishna Pra-kash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 725 (quoting 1788 North Carolina ratification debate) (brackets omitted). But it suffers a major defeat today and will suffer more if today’s decision stands. In my view, the CFPB violates Article II and should be invalidated top to bottom. Accordingly, I dissent. . The Congress’s abdication of financial responsibility for the CFPB may give rise to Article I objections beyond the scope of this opinion, For my purpose, the deficiency in congressional oversight is important because it is one of several factors distinguishing this case from Humphrey’s Executor. . I found it unnecessary to decide the CFPB’s constitutionality at the panel stage because PHH sought the same relief (“vacatur”) whether we endorsed its constitutional claim or its statutory claims, the latter of which the panel unanimously found meritorious. PHH Corp. v. CFPB, 839 F.3d 1, 56-60 (D.C. Cir. 2016) (Henderson, J., concurring in part and dissenting in part), vacated Upon grant of reh’g en banc (Feb. 16, 2017); see PHH Panel Br. 23-24, 61-62; PHH Panel Reply Br. 31. But unlike its panel briefs, PHH’s en banc briefs expressly ask that the Director’s decision "be vacated without remand” and that the Court "forbid the CFPB from resuming proceedings.” PHH Br. 58; PHH Reply Br. 29. Because that relief is warranted only if the CFPB is unconstitutionally structured, I believe the constitutional question can no longer ‘be avoided. See Citizens United v. FEC, 558 U.S, 310, 375, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) , (Roberts, C.J., concurring) ("When constitutional- questions are ‘indispensably necessary’ to resolving the case at hand, ‘the court must meet and decide them.’ ” (quoting Ex parte Randolph, 20 F. Cas. 242, 254, (No. 11558) (CC Va. 1833) (Marshall,'c.J.))); see also infra note 17. In any event, because the majority decides the constitutional question and gets it wrong, I see no reason to withhold my views. Cf. Freytag v. Comm'r, 501 U.S. 868, 892-922, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring in part and concurring in the judgment) (expressing views on merits after disagreeing with Court’s decision to reach Appointments Clause issue). . In this opinion, I use the term “independent agency” -to mean an agency whose principal officers enjoy protection from removal at the President’s will. See Free Enter. Fund, 561 U.S. at 483, 130 S.Ct. 3138. . Many years later, the Supreme Court noted that Myers had been suspected of fraud. Raines v. Byrd, 521 U.S. 811, 827, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Historical records indicate that he also alienated colleagues and ensnared himself in one political dustup after another. See Jonathan L. Entin, The Curious Case of the Pompous Postmaster. Myers v. United States, 65 Case W. Res. L. REV. 1059, 1062-64 (2015) (citing contemporaneous news accounts and personal letters). . Title X permits the Director to continue serving "after the expiration of the term for which [he is] appointed, until a successor has ■been appointed and qualified,” 12 U.S.C, § 5491(c)(2), Citing a CFPB concession, Oral Arg. Tr. 48-49, the Court suggests the President may remove the Director at will during any holdover period, Maj. Op. 81 n.l. I agree. Nothing in the statute authorizes the- Senate to keep a holdover Director in office against the President’s will by failing to act on a nominee even after expiration of the Director's term has triggered the President's appointment power under 12 U.S.C. § 5491(b)(2). Cf. Swan v. Clinton, 100 F.3d 973, 981-88 (D.C. Cir. 1996) (no good-cause protection for holdover board member of National Credit Union Administration). . Through three quarters of fiscal year 2017, the Director claimed $517.4 million, putting him on pace for the maximum of $646.2 million for the year. CFPB, Semiannual Report 122 (Spring 2017), .perma.ee/M7XD-4QMT. . Some commentators have suggested that a provision permitting removal for " ‘inefficiency, neglect of duty, or malfeasance in office’ ” allows the President "to discharge officials whom he finds incompetent because of their consistently foolish p.olicy choices." Richard H. Pildes & Cass R. Sunstein, Reinventing the Regulatory State, 62 U. CHI. L. REV. 1, 30 (1995). Humphrey's Executor leaves little or no room for that argument: the Supreme Court rebuffed President Roosevelt’s attempt to remove Humphrey based on the policies Humphrey had pursued for years. 295 U.S. at 619, 55 S.Ct. 869 (President told Humphrey, "I do not feel that your mind and my mind go along together on either the policies or the administering of the Federal Trade Commission” (internal quotation omitted)); see Free Enter. Fund, 561 U.S. at 502, 130 S.Ct. 3138 (reading Humphrey's Executor to suggest that "simple disagreement with [an official’s] policies or priorities" does not "constitute 'good cause’ for [his] removal”); see also Amicus Br. of Current and Former Members of Congress Supporting CFPB 2 (arguing that 12 U.S.C. § 5491(c)(3) does not permit President to remove Director "for policy differences alone”); Press Conference, Financial Regulations Bill, C-SPAN (Mar. 24, 2010) (Rep. Frank: “I am obviously committed to a very strong independent consumer agency that can’t be overruled on policy grounds ....”), www.c-span.org/video/P292698-2/financial-regulations-bill (3:52-3:58). In a testament to how difficult it may be to remove a principal officer for cause, the CFPB admits that it "cannot” provide "any example where an agency head has been actually successfully removed for cause.” Oral Arg. Tr. 72. In any event, if Article II authorizes the President to remove a particular officer at will, he should not have to concern himself with the potential political cost of asserting inefficiency, neglect or malfeasance as cover for a policy choice. Cf. Free Enter. Fund, 561 U.S. at 547, 130 S.Ct. 3138 (Breyer, J., dissenting). . See also, e.g., 156 CONG. REC. 2052 (statement of Rep. Tsongas) (CFPB was designed to "level [the] playing field”); id. at 6240 (statement of Sen. Franken) (it is "an independent watchdog for consumers”); id. at 7486 (statement of Sen. Dodd) (it is "one single, empowered, focused cop on the consumer protection beat”); id. at 11814 (statement of Rep. Lee) fit "puts consumers first”); id. (statement of Rep. Fudge) (it' ”hold[s] Wall Street and the big banks accountable”); id. at 12414 (statement of Rep. McGovern) (it "empower[s] consumers”); id. at 12434 (statement of Rep. Maloney) (it is "on their side”); id. at 13135 (statement of Sen. Cardin) (it "represent[s]” consumers "in the financial structure”). . During oral argument before the en banc Court, there was much discussion about our being bound by Morrison whether we like it or not Oral Arg. Tr. 12-17, 25-26, 30-31, 82-83. Today, three of my colleagues continue to push the point. Tatel Concurring Op. 5 (joined by Millett and Pillard, JJ.). I do not contradict it. See Hutto v. Davis, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.”). All but lost in that discussion, however, has been the distinction between this case’s principal officer and Morrison’s inferior officer. Counsel at oral argument only fleetingly mentioned it. Oral Arg. Tr. 15, 30-31, 83. The majority relegates it to an ipse dixit footnote, Maj. Op. 96 n.2, ignoring vital discussion in Myers, 272 U.S. at 126-29, 47 S.Ct. 21; see supra p. 79, 96 S.Ct, 612. And my colleagues in concurrence denigrate the distinction as "strained” without explaining why. Tatel Concurring Op. 113. I submit they can’t. The Supreme Court has described Morrison, together with Perkins, 116 U.S. at 485, 6 S.Ct. 449, as cases in which "the Court sustained ... restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors," Free Enter. Fund., 561 U.S. at 483, 130 S.Ct. 3138 (emphasis added). Administrations across the political spectrum have recognized that Morrison does not apply to removal of a principal officer. See The Constitutional Separation of Powers Between the President and Congress, 20 Op. O.L.C. 124, 169 (1996) ("The Morrison Court ... had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation.”), perma.cc/DF3R-FFER; Amicus Br. of United States 14 n,3 (Monison "obviously does not apply to any principal officer who heads an executive agency”). And most importantly, Article II itself distinguishes between principal and inferior. U.S. Const, art. II, § 2, cl. 2; see 1 Annals of Cong. 548 (statement of James Madison) ("If the gentleman admits that the Legislature may vest the power of removal, with respect to inferior officers, he must also admit that the Constitution vests the President with the power of removal in the case of superior officers; because both powers are implied in the same words.”). . Two of my colleagues think it significant not just that the Director has adjudicative power but that this case involves adjudication rather than enforcement. Wilkins Concurring Op. 113, 114, 117 (joined by Rogers, J.). At best that is an argument for reserving judgment until, in a future case, a regulated party challenges the CFPB’s structure in the context > of a rulemaking. It is not a basis for giving the agency an all-encompassing stamp of Article II approval in an opinion that does not purport to limit itself to cases involving adjudication. See generally Maj. Op. 75-110 (joined by Rogers and Wilkins, JJ.). In any event, no one has cited any authority for the idea that the CFPB’s constitutionality may differ case by case, depending on whether and to what extent the Director is wearing his adjudicator’s hat. . My colleagues also neglect the context of Madison’s statement. He made it in proposing that the Comptroller have fixed tenure "unless sooner removed by the President,” presumably for cause only. 1 Annals of Cong. 612, His colleagues, including his allies, disagreed with the proposal. Theodore Sedgwick, for one, objected that the Comptroller’s duties were both sufficiently "important” and sufficiently “Executive” that "the man who has to perform them ought ... to be dependent upon the President.” Id. at 613. Likewise, Egbert Benson lamented that Madison’s proposal "set[] afloat” what the House had already resolved: namely, that "judges hold their[] [offices] during good behaviour, as established by the Constitution” and that "all others [serve] during pleasure.” Id. at 614. Madison—who was known to change his mind, see, e.g., Klarman, supra, at 384, 392-93, 561-66, 574-75, 737 n.300, 799 n.58; David A. O’Neil, The Political Safeguards of Executive Privilege, 60 Vand. L..Rev. 1079, 1134 & nn.232-35 (2007)—withdrew his proposal the very next day. 1 Annals of Cong. 615. . I concede that Myers and Free Enterprise Fund do not squarely dictate the outcome here. The CFPB Director does not resemble a first-class postmaster and Title X does not •puiport to require the • Senate’s advice and consent to. remove him. Nor is the Director ensconced in multiple layers of for-cause removal protection. Recognizing as much, however, does not negate the textual, structural • and functional lessons of Myers and Free Enterprise Fund. They are the best guidance ,we have about the original and enduring meaning of Article II. . This is not a farfetched hypothetical. The principal officers of each agency already have for-cause removal protection. 15 U.S.C. § 41 (expressly providing it for FTC commissioners); Free Enter. Fund., 561 U.S. at 487, 130 S.Ct. 3138 (assuming, even absent express provision, that SEC commissioners have it); FEC v. NRA Political Victory Fund, 6 F.3d 821, 826 (D.C. Cir. 1993) (same as to FEC commissioners); 29 U.S.C. § 153(a) (expressly providing it for NLRB members). Also, the principal officers of each agency already enjoy tenure of at least five years. 15 U.S.C. § 41 (seven years for FTC commissioners); 15 U.S.C.. § 78d(a) (five years for SEC commissioners); 52 U.S.C. § 30106(a)(2)(A) (six years for FEC commissioners); 29 U.S.C. § 153(a) (five years for NLRB members). . In my view, there is no constitutionally appropriate stand-in for the President’s removal power. See Horne v. USDA, — U.S. —, 135 S.Ct. 2419, 2428, 192 L.Ed.2d 388 (2015) (because Constitution "is concerned with means as well as ends,” court cannot permit "shorter cut than the constitutional way” (internal quotation omitted)),' But because the majority downgrades at-will removal to a congressional benefaction, we should at least require the Congress to devise a second-best way of ensuring the CFPB answers to the people. ■ . A few months later, the Congress passed and the President signed a joint resolution that disapproves the rule. Joint Resolution' of Nov. 1, 2017, Pub. L. No. 115-74, 131 Stat. 1243, perma.cc/U4GE-6W72. The Congress acted pursuant to the Congressional Review Act (CRA), 5 U.S.C. §§ 801 et seq., which authorizes it to disapprove an agency rule by simple majority in both Houses within 60 legislative days after the agency submits the rule. See Daniel Cohen & Peter L. Strauss, Congressional Review• of Agency Regulations, 49 Admin. L. Rev. 95, 96-102 (1997) (detailing CRA’s provisions and procedures). Regarding the CFPB, the CRA is not an adequate substitute for at-will removal, especially in light of its inapplicability to enforcement actions. . I recognize that severability is to be considered “when confronting a constitutional flaw in a statute,” Free Enter. Fund, 561 U.S. at 508, 130 S.Ct. 3138 (internal quotation omitted), and that my colleagues in the majority find no such flaw in Title X. I nonetheless address severability because it bears on my threshold view that we must decide the Article II question in light of the relief PHH now seeks: vacatur without remand and cessation of any further proceedings. See supra note 3; cf. INS v. Chadha, 462 U.S. 919, 931-36, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (addressing severability at threshold because it bore on standing). . Section 5491(a) also says that the CFPB "shall be considered an Executive agency, as defined in section 105 of Title 5.” All that really means, however, is that the agency is an arm of the federal government: for the purpose of 5..U.S.C. § 105, an "Executive agency” includes not only "an Executive department” but also "a Government corporation” and "an independent establishment.” . Title X's proponents modeled the CFPB in part on the Consumer Product Safety Commission. See, e.g., Warren, Unsafe at Any Rate, supra• 156 Cong. Rec. 6219 (statement of Sen. Dodd); id.- at 6237 (statement of Sen. White-house); id. at 6239 (statement of Sen. Merk-ley); id. at 6363 (statement of Sen. Durbin). But they also learned a lesson from the Commission: because it is subject to appropriations, it answers to “budgetary politics” and has long suffered policy-based cuts.- Harris & Milkis, supra, at 124; see, e.g., id. (describing cuts under President Reagan); Eric Lipton,. Safety Agency Faces Scrutiny Amid Changes, N.Y, Times, Sept. 2, 2007 (describing cuts under President George W. Bush), nyti. ms/2jKa!6h. . In general, an agency without a for-cause removal statute is an executive agency, not an independent agency, because the President may supervise, direct, and remove at will the heads of those agencies. That said, in the period from Myers (1926) to Humphrey’s Executor (1935), Congress created several multi-member agencies that did not include for-cause provisions, apparently because Congress interpreted Myers to outlaw independent agencies. Those agencies included the FCC and the SEC. After Humphrey's Executor, those multi-member agencies were treated as independent agencies even though the relevant statutes did not include for-cause provisions. Cf. Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 487, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (deciding case on assumption that SEC is an independent agency). Because those agencies’ statutes do not contain express for-cause provisions, some have suggested that those agencies actually are and should be treated as executive agencies. See Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769, 834-35 (2013); Note, The SEC Is Not an Independent Agency, 126 Harv. L. Rev. 781, 801 (2013). I do not tackle that question in this opinion and do not imply an answer one way or the other about the executive or independent status of the multi-mem-ber agencies that lack express for-cause removal provisions.